Next case on the docket is People v. Coston. It's 5-13-456. Counselor, ready to proceed? May it please the court, my name is Gil Cison, and I represent the defendant appellate, Danny Coston. Mr. Coston was convicted after a bench trial in White County of first degree murder, second degree murder, and criminal sexual assault. Mr. Coston comes here today and appeals the trial court's ruling on his motion to suppress statements. That motion delves out of three interviews that he did with the White County Sheriff's Office on August 31st, 2012. In that instance, he did finally confess that he was involved in the murders of Jacob Wheeler and Jessica Evans. Now, eventually, there are two relevant issues on appeal. The first is, did the trial court err in concluding that Mr. Coston was not in custody for the first two of those three interviews? And the second issue is, did the trial court err in concluding that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights for all three interviews? Now, turning first to the issue of custody, and whether Mr. Coston was in custody, it is true that in analyzing custody, the court must look to the circumstances behind the interrogation. And the courts, Illinois courts, have put together a list of factors, for example, that the courts must look at in determining whether or not that person was indeed in custody. One of those factors, for example, is the location, the time, the length, and the mood and the mode of the question. Second is the number of police officers that were present during the process, or absence of family and friends. And the fourth is any indicia of formal arrest procedures, such as whether there was any show of force, whether there was any weapons drawn, whether he was fingerprinted or booked, etc. Secondly, the fifth, the manner by which the person arrived at the place of questioning, and finally, the age, intelligence, and mental makeup of the accused. Now, in this case, the trial court did sort of go through these factors, and it did come to the conclusion that Mr. Coston was, in fact, not in custody for the first two interviews. However, where the trial court erred is, is it placed too much emphasis on these factors at the expense of the ultimate analysis. And the ultimate analysis, Your Honors, is simply this, is what would a reasonable person have believed, would a reasonable person have believed that he could terminate the interview, and would he be free to leave? What a reasonable person would have believed. It's an objective test, Your Honor. Now, in this case, yes, I will candidly admit that the totality of the circumstances guides the Court's rulings here. But the Court must be careful that the totality of the circumstances analysis isn't just simply, for example, okay, I've got three factors on one end, and I've got one factor on the other end, and therefore, I'm going to rule on this end. Now, there are cases where that is indeed the case, and that is indeed called for, but a totality of the circumstances analysis means simply that no one factor is preclusive, or no one factor could be dispositive. But there are certain circumstances where it could, and this is the case where it is, because in this case, Your Honors, before, during the interview, during Mr. Coston's interview, the law enforcement officer that was questioning him told him specifically that he was in custody. So the question begs the question, what would a reasonable person believe if the person interviewing you told you that you were already in custody? And let me read for you exactly from the transcript the words that were used to convey that he was in fact in custody. And this is from Detective White. It says, quote, for people who are in custody, and you are in a cop shop, he's referring to Mr. Coston, you are in a cop shop here, and we are interviewing you about something very, very serious. And we have your trial. And so technically, you are in custody. Those were Detective White's words. Now, the trial court attempts to dispense with this by basically concluding that, A, the subjective views of the officer are not controllable. That's true, and the trial court did cite People v. Boyer for that proposition. However, in Boyer, the subjective views of the officer were not disclosed to the interviewee. In this case, they were. And so again, it begs the question, what would a reasonable person have believed if the officer interviewing you told you you were in custody? And so we believe it can only come to one logical conclusion, is that Mr. Coston was in custody. And so we believe that Mr. Coston was in custody. Now, assuming the trial court agrees that Mr. Coston was in custody, the next analysis is whether or not Mr. Coston did validly and intelligently waive his Miranda rights. And we'll candidly concede that in the first interview, the Miranda rights were written, and that he did sign an initial form with his name on it. However, the simple referencing or the reading of Miranda rights is not sufficient by itself to find a valid and knowing and intelligent waiver. It is one part of the analysis. Now, in this case, what you have is a situation where a transcript and videos closely show is that he was sort of confused. He said, well, I thought you only did this, this is Mr. Coston. I thought you only did this when people were arrested. And that's what led to the statement that I just read to you about, well, you know, you're in a cop shop, you know, we have your truck, you know, and, you know, we're going to read you your rights. You know, and prior to him signing the waiver, you know, there's a specific question that's posed to him, and the officer asks him, are you 50 years of age? And there was no response. And so, and he just proceeds, the video shows he just proceeds to sign an initial, the waiver rights form. Now, what's lacking here, Your Honors, is there was no follow-up questions from the officer to say, okay, Mr. Coston, have you read that form? Okay. Do you have any questions about it? Okay. Do you understand what you're doing here? Okay. Do you still want to talk to us? Let's go. If you look at all three interviews, I mean, in the second and the third were even worse because the second and third interviews, there were no full Miranda rights ever, ever read to him. As a matter of fact, you remember the Miranda rights were read to you back in the beginning. You know, you remember you don't have to say anything. Are you okay with that? Are you good? Okay. Well, let's go. Well, in this case, the reason why a simple reading of the form and the reading and writing and the signing of the waiver is insufficient is because we just need to look to two practical examples to show that that's not the case. That simply cannot be a waiver. And in this case, it's important to know what a waiver is. A waiver means that you have to knowingly and intelligently give up something. And it means you must have full awareness of both the nature of the right that's being given up and the consequences if you do decide to give it up. I can state this more eloquently in the case of people who are first and happy that I think was cited in the state's brief. And the court referred to waiver as one must at least understand basically what the rights encompass and minimally what that waiver will entail. Are you arguing that he can't read or write? No, I'm not. I'm not. I'm simply arguing that here the simple act of reading the rights and the waiver form itself is insufficient without one. It's insufficient even in this case. It's insufficient to show a valid in one way. And let me give you an example. First example that a lot of people should be familiar here with is when law enforcement or even when attorneys question witnesses. I know, for example, when I brought third-party witnesses into my office, I'd bring them in. I'd tell them, you know what? You don't have to be here. You're free to go at any time. You don't have to answer any of my questions. Are you free? Do you still want to continue? Are you okay with that? And they'd go. And the reason we do that is because as lawyers, we don't want to be looked at as, for example, we're coercing them to stay or we feel that they're forced to give us some sort of statement which might end up impacting our case somewhere down the line. Now, in this case, the trial court seemed to put pretty focus on the coercion aspect, the fact that there was no intimidation tactics, the fact that there was no coercion, the fact that there was no trickery involved. And that's true. We'll candidly admit that. But it's not sufficient. And why is that not sufficient? We simply need to turn to the next example I'm going to provide, and that's the example of a plea cut, which every judge here should be familiar with, every one of us. So whenever you go to the plea colloquy, that colloquy is designed, for example, for a person to waive his presumption of innocence. Waiver of presumption of innocence is no greater or no worse than the waiver of the right to privilege against self-incrimination. And when that judge comes up there and questions that defendant, he's asked, do you understand these rights? Even if there's a written plea agreement, he'll go through the agreement and he'll say, is this your signature? Okay. Did you read this before you signed it? Okay. Did you discuss this with your attorney before you signed it? Yes. If it was a simple matter of writing your name on a document and be done, that'd be it. But it's not. The reason you go through that colloquy, the reason you go through that is because you want to make sure that the defendant's waiver is known and voluntary. Well, he didn't have to ask the question, is that your signature? He saw him sign it, didn't he? I'm sorry? Didn't he see him sign it? He did. The video does show him signing it. So you got to ask him the question, you think? And what led to that, what led to leading up to the waiver, leading up to him signing the waiver, there was a question I told the court initially that, well, I thought you only did this when people were being arrested, you know, and then that's when the whole conversation came in about, no, you've got to be in custody. The key word is custody. So at least we know that there was some confusion or at least some initial confusion about it. In the cases that I've seen, you know, there's one case in particular, and the case name escapes me, is where a person, and I think it was argued at the motion to suppress hearing, is where the person was offered to say, well, let me read you your rights. And he goes, no, I understand my rights. I'm good. I'm good. You know, and the court found that that was okay. Well, in this case, you have a situation where, yes, you have some indicia, some indicia of waiving, but not a full understanding of whether that waiver is knowing and voluntary. And that's all I'm asking is, in the criminal justice system, why should a defendant's rights be treated any differently in a law enforcement officer's office, in the White County Sheriff's Office, than it is before a judicial circuit in anywhere in the court of Illinois? Now, the things that referred to that the court noted to that he acknowledged his rights were that he nodded his head. Or he never said anything, but he nodded his head in agreement. I can tell you that most judges that I know, that if you were in a plea colloquy and that person nodded his head, that judge is going to ask a follow-up question, and he's going to go, okay, okay, you nodded your head. Can I assume that that's a yes or a no? Can I assume that that's a yes? Okay. Not let the record show a defendant's nodding his head. The record did show that the defendant nodded his head. That's another way of approaching it. Well, it is, but what we're saying here is that law enforcement officers just needed to take a little bit more of a step. Not much. Candidly, not much. But just a little bit more to be sure that the waiver was knowing and voluntary. All of them required, and the transcript shows this, that the officers did not follow up and ask questions such as, okay, do you just understand what you read here? Okay. Do you have any further questions? Okay, we're going to question. I mean, I'll grant you that the circumstances do point, at least point, at least initially, that yes, for example, yes, that the waiver could have been knowing and voluntary. But what I'm saying is you needed to take that little extra step. And why is that? It's because we require that in our courts of law when a person gives up his presumption of innocence. And that's what's sort of frustrating, just for me, from a personal perspective, reading and reviewing these cases, is that there seems to be a double standard. In a plea colloquy, yes, absolutely. You've got the record has to be clear that you're waiving and giving up your presumption of innocence. But in cases, I've seen cases go all across the board, not just in Illinois, but in federal district courts, and even in my home state of Missouri, where, oh, just a simple waiving, reading of the rights, and the waiver of the rights would be sufficient. Well, no, it shouldn't be. And that's what I'm asking this court to do, is why can't law enforcement just take that little extra step to ensure the waiver is knowing and voluntary? That's it. To be honest, if there are no further questions, in conclusion, first, I'd like the court to find that Mr. Costner was in custody when he was interviewed. Secondly, that he did not, or at least there was not sufficient evidence showing that he knowingly, voluntarily, and intelligently waived his Miranda rights. And for those reasons, we believe the trial court's decision on the motion to suppress should be reversed, and the conviction should be voided at first. Thank you. Thank you, counsel. Your honors, counsel, may it please the court, Kelly Stacey appearing on behalf of the state. In April of last year, the defendant filed a supplemental motion to suppress the inculpatory statements he made regarding the death of Jessica Evans and the disappearance of Jacob Wheeler. Once truck parts were identified at the murder scene, they were believed to come from a Toyota pickup truck, a green pickup truck, that officers were aware a defendant owned a Toyota pickup truck. Detective Rick White and Sheriff Meyer went to the defendant's workplace, which was Marshall Electric. They came up to the parking lot and saw the defendant's truck sitting there. As they were looking at the truck, the defendant drove up in a work truck belonging to Marshall Electric. Officers asked the defendant to go to the sheriff's office to answer some questions. They asked the defendant to ride with them because his pickup truck was going to be reviewed for any evidence and was going to be the subject of a search warrant. The defendant rode in the front seat of the vehicle. Detective White rode in the back seat, and Sheriff Meyer drove. The defendant was not restrained or handcuffed in any way. The vehicle was an unmarked vehicle, and when they went into the sheriff's department, officers gave the defendant his Miranda rights, the full rights. Prior to the initial interview, Detective Rick White told the defendant he was not under arrest, but because they were at the cop shop talking, he would go ahead and read the defendant his rights. The detective read the rights and asked the defendant to initial after each one of those rights if he did understand what those rights were. As he started to initial the form, the defendant said, I thought you guys just did this when somebody was under arrest. And the detective responded, well, the big turn you have to go by is in custody. Detective White said the defendant was kind of in custody because he was picked up in the sheriff's car, was at the sheriff's office for interviews, and Detective White again told the defendant he was not under arrest, but they were getting ready to question him, so it was probably the right thing to do to go ahead and give him his Miranda rights. At issue, as counsel indicated, are three interviews of the defendant that were all three audio and video recorded in the sheriff's department. The trial court watched all three of those videos and determined that the start of the third interview was approximately 8 hours and 50 minutes from the start of the first interview, meaning the start of the first interview is when the defendant was given the Miranda warnings. Approximately 8 hours and 50 minutes later was the start of the third interview. The trial court found that the defendant voluntarily agreed to go to the sheriff's department and that the defendant was not in custody during the first two interviews, but the defendant was in custody for the third interview. In the third interview, it's pretty obvious that the defendant is in custody because he's sitting in an orange jail uniform. Both the state and the defense agreed that, in addition to the circumstances surrounding the interrogation, the test for whether a person is in custody is an objective one, and that is would a reasonable person, innocent of any crime, have believed he could terminate the interview and was free to leave. The trial court analyzed the circumstances surrounding the interrogation and noted that if a person is not in custody, Miranda warnings are not required. The court also noted that just because a defendant has read his Miranda rights does not transform this subsequent interview into a custodial interrogation. In particular, the court noted that the defendant's subjective belief that he was under arrest or in custody, or even the interrogating officer's subjective belief or opinion or intent that the defendant is in custody is not the controlling issue. The court noted it was for the trial court to determine and consider the totality of the circumstances and objectively decide whether the defendant is in custody for purposes of triggering the Miranda obligation. The trial court found that even though officers were not legally required to give the defendant the Miranda warnings at the start of the interviews, the officers did do that, that he was given all his Miranda warnings. It's true the defendant was not fully re-Mirandaized prior to the second and third interviews, but the trial court noted that the second interview began two hours after the defendant had been read all of his rights and signed off on the Miranda waiver form that he understood what those rights were. Before the second interview, Sheriff Meyer did remind the defendant that you've previously been read your rights, do you understand you don't have to say anything, and he asked the defendant if he understood all his rights. As Justice Welch noted, the defendant nodded his head in the affirmative and said what the trial court determined was uh-huh. The second interview then began and it lasted 64 minutes. At the start of the third interview, Sheriff Meyer reminded the defendant that audio and video were still running. The sheriff told the defendant he had his Miranda rights and that he did not have to talk to them. Sheriff Meyer asked the defendant if he wanted to talk to them, and the defendant nodded his head in the affirmative. The record shows the defendant did understand he was being audio and video recorded because he indicated on the video that I just sat here and told you I think I shot this kid. The trial court noted that even though Detective White testified at the hearing on the motion that he considered the defendant to be in custody for Miranda purposes, the test to be applied is an objective one, and Detective White's opinion was not controlling on that issue. The state acknowledges it's a bit of a subtle distinction where during the interview Detective White disclosed to the defendant you're at a cop shop, so you're kind of in custody, but you're not under arrest. It was only at hearing on the motion to suppress under cross-examination that the detective testified he considered the defendant to be in custody for Miranda purposes. Again, the court determined this was an objective test, and the court did seem to draw a distinction. The trial court found that Miranda warnings were required during the third interview, but not the first and second interview. Obviously, the defendant was given the Miranda warnings prior to the first interview, was reminded again at the following two interviews. And raised by the defense in the brief was that sometimes Miranda warnings can become stale, and it is true there are cases where that has happened. Here the trial court specifically looked at those types of cases, noted that in some cases two and a half hours was not too stale, all the way up to a time period of three days can be determined not to be too stale. The court reviewed one Supreme Court case and numerous appellate court cases. The court noted that the defendant was calm and at ease during the questioning. He did not appear to be puzzled or confused, and he didn't ask any questions at all, even though he knew he could ask questions. He did ask a question during that first interview. Don't you only do this when someone's under arrest? So the trial court properly concluded the defendant knew what his rights were, that he understood those rights, and that he voluntarily waived those rights. Here there were no weapons displayed, there was no type of force, and the defendant was properly advised of his rights at the start of the first interview. We believe that the trial court properly found that the defendant was not infested for the first and second interviews. He was for the third. He was fully Mirandized and that at the time of the third interview, those warnings had not become stale, that the defendant actually knew what rights he was giving up. At no time during the entire interviews did the defendant ask questioning to stop. He never invoked his right to remain silent, and at no time did he request an attorney. The only time an attorney was requested was after the conclusion of the third interview, at which time no further questioning went on. The people respectfully request the court affirm the decision of the trial court. Thank you, Your Honors. Thank you, Counsel. Rebuttal? Just a few points on rebuttal, Your Honors. The opposing counsel brought up the fact about the interview of the question, like when he questioned me after the interview, and I actually forgot the timing of it. Actually, I think this actually sort of supports our position a little bit, because he initialed and then he asked the question. He asked the question of, oh, wait, I questionably did this after you were arrested, and then you had the custody requirement. So clearly he's showing some, oh, wait a minute, what's this about? And so, again, I would posit that the position shouldn't be. Is it okay? Well, law enforcement should clarify. Okay, did you understand what you just read? What do you not understand about this? Okay? You know, it's just a small step to take, a very, very small step to take. The next thing that was noted, I think, that opposing counsel noted that he was brought in his truck, or I think that the truck was an issue, which is true. That was why he was targeted as a person of interest and a person that needed to be interviewed. And basically he didn't drive to. He was actually accompanied by officers, which is a fact that I forgot to mention, which is the method and manner of how you accompany and how you go there. And because he didn't have his own transportation, I mean, basically, you couple that with the fact that law enforcement brings him there. He can't use his truck. And then law enforcement tells him that he's in custody. What more is a reasonable person supposed to believe? Second, dealing with whether the waiver was knowing and voluntary. The reason we're asking this court to show, or to at least require, that law enforcement make that de-lexer step, is it, and we did cite the Braggs case, which is factually different from this case. In Braggs, for example, that person was mentally disabled, mentally handicapped. In this case, there's no evidence that he was now. But that doesn't mean that these prophylactic measures shouldn't be enforced for people of varying degrees of intelligence. Yes, intelligence is a factor that one considers in whether or not the waiver is knowing and voluntary. But the simple notion of whether or not you understand what you're giving up is very, very important. It's not just about whether you were coerced or whether there was no intimidation tactics. Going back to the notion of the plea copy, a judge does ask a criminal defendant, has anyone coerced you? Has anyone intimidated you? Has anyone forced you to do this? Because that's only one aspect of whether or not the waiver is knowing and voluntary. In this case, yes, I will candidly admit there was no coercion. There was no intimidation tactics. But that's only one aspect of it. Did he truly understand what he was giving up, which required, at least from our submissions, law enforcement to take one small extra step, which is confirm that he knew what he was getting into. Again, the record shows there was no follow-up by any of the officers after any of the three of the interviews. Do you understand your rights? Do you have any questions about your rights? Do you understand what you're giving up? Okay, let's proceed. And because of that, we believe that the waiver was not knowing and voluntary, and therefore that the motion to suppress was improperly overruled, and why this court should overrule the judgment. Thank you. Thank you, Counsel. Counsel is excused, and we'll take the case under advisement. We'll take a short recess before calling the next case.